IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

BUFFALO RIVER WATERSHED ALLIANCE                                        PLAINTIFF

V.                                     CASE NO. 3:23-CV-3012

UNITED STATES FOREST SERVICE
and TIMOTHY E. JONES, District Ranger                                   DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

In 2005, the United States Forest Service devised an ambitious plan to create a
more resilient and biodiverse ecosystem in the Ozark National Forest. Large tracts of the
Forest had undergone significant ecological changes over the past several decades, due
in part to increased tourism, active fire suppression strategies, the prevalence of certain
tree insects and diseases, and the spread of invasive plant species. The Forest Service
blamed its lack of proactive management for these conditions and feared failing to act
would lead to a decline in native wildlife and aquatic species and a high likelihood of
catastrophic wildfires. To address these concerns, the Forest Service partnered with other
federal agencies to write a comprehensive Forest Management Plan and Environmental
Impact Statement which approved the use of herbicides, selective thinning of trees and
understory vegetation, and controlled applications of fire to improve the health of the
Ozark National Forest. These methods were to be implemented one section of the Forest
at a time after careful study and input from the public.

One such study targeted a 40,000-acre tract of wilderness called Robert's Gap,
which is located in Northern Arkansas immediately upstream from the Buffalo National
River. The Forest Service's investigation into the Robert's Gap Project spanned nearly

1

five years, from 2017 to 2021. During that time, the Forest Service developed a proposal for action that was consistent with the 2005 Forest Plan's overall goals. The proposal also considered various alternatives to the Forest Service's recommendations and requested public input and objections. One public interest group whose members objected to various aspects of the Robert's Gap Project was Buffalo River Watershed Alliance ("BRWA"). After the Project was approved, BRWA filed suit in this Court alleging that the Forest Service violated the National Environmental Policy Act ("NEPA").

Before the Court are the parties' Cross-Motions for Summary Judgment (Docs. 38 & 45), their responses and replies, and the voluminous administrative record. On May 13, 2024, counsel appeared for an in-person hearing and presented oral argument on the Motions. Now having considered these matters, the Court finds in favor of the Forest Service and **GRANTS** its Motion for Summary Judgment; BRWA's Motion is **DENIED**.

## I. BACKGROUND

### A. Overview of NEPA's Requirements

Before launching into the background of the Robert's Gap Project, it is necessary to gain a preliminary understanding of the law at issue here, NEPA, and its governing regulations. Congress enacted NEPA for two reasons: (1) to "place[ ] upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action," *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978); and (2) to "ensure[ ] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process," *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

Among the key procedural aspects of NEPA are public participation and disclosure. *See* 42 U.S.C. §§ 4321, 4332; 40 C.F.R. §§ 1500.1(a)–(b) (2019). NEPA requires that

2

agencies make high-quality information available to the public, including "[a]ccurate scientific analysis [and] expert agency comments," before an agency makes decisions and acts. 40 C.F.R. § 1500.1(b). Though abundant paperwork is the natural result of NEPA compliance, "NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action" designed to "protect, restore, and enhance the environment." *Id.* § 1500.1(c).

Plaintiff BRWA argues that the Forest Service violated NEPA by failing to prepare a detailed Environmental Impact Statement, or "EIS." NEPA generally instructs that an agency should prepare an EIS when its proposed plan of action could "significantly affect[ ] the quality of the human environment." *Id*. § 4332(2)(C). However, because a full-scale EIS is "very costly and time-consuming to prepare,'" *Friends of Fiery Gizzard v. Farmers Home Admin*., 61 F.3d 501, 504 (6th Cir. 1995), "an agency need not complete an EIS for a particular proposal if it finds, on the basis of a shorter 'environmental assessment' (EA), that the proposed action will not have a significant impact on the environment," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 145 (2010).

In the case at bar, the Forest Service made an initial determination that its proposal to remediate the Robert's Gap area did not require an EIS because it was not likely to significantly impact the environment. Based on that assumption, the agency decided to prepare an EA for the Project rather than an EIS. NEPA's regulations describe an EA as a "concise" document that includes "brief discussions" of the need for the action, its impacts, and alternative courses of action, including doing nothing (the "No Action" alternative). 40 C.F.R. § 1508.9(a)–(b).

If an agency prepares an EA and then becomes persuaded that its proposed action could, in fact, significantly affect the environment, then the agency *must* switch gears and write a lengthier and more costly EIS. *Id*. § 1508.9(a)(1). However, if the EA reveals that an EIS is not warranted, the agency's next task is to prepare a document called "Finding of No Significant Impact," or "FONSI," for short. *Id*. §§ 1508.9(a), 1501.4(c). Then, the agency will issue a Decision Notice approving the project. 36 C.F.R. §§ 220.3, 220.7(c). In this case, the Forest Service: (1) approved a Final EA for the Robert's Gap Project, (2) issued a Final Decision Notice and FONSI, and (3) did not find it necessary to prepare either an EIS or supplemental EA.

### B. Factual Background

#### 1.  The Forest Plan

The Forest Service manages two National Forests in Arkansas: the Ozark National Forest, which spans 1.2 million acres of wilderness, and the St. Francis National Forest, which has just over 22,000 acres. Within the Ozark National Forest is Robert's Gap, totaling 39,697 acres, near the communities of Boston, Fallsville, and Red Star, Arkansas. Robert's Gap encompasses a portion of the Buffalo River Watershed, which empties into the Buffalo National River. The area also contains a number of popular scenic attractions such as Hawksbill Crag.

The Forest Service's 2005 Land and Resource Management Plan ("Forest Plan"), which covers both the Ozark and St. Francis National Forests, is a NEPA-compliant document. It is actually the fourteenth amendment to the original forest plan originally approved in 1986. *See* Doc. 52-1, p. 309. The Forest Plan does not describe site-specific projects but instead "establish[es] overall goals and objectives (or desired resource conditions) that the [Ozark-St. Francis National Forests] strive[ ] to meet." (Doc. 52-1, p.

309). These goals are in line with the nationwide objective of protecting our national forests from four main threats: "(1) prevent[ing] severe wildfires; (2) stop[ping] the introduction, establishment, and spread of invasive species; (3) reduc[ing] the conversion of forest and grasslands that leads to fragmentation of rural landscapes through subdivision; and (4) manag[ing] impacts of motorized recreation vehicles by restricting use to designated roads and trails." *Id.* at p. 18.

The Forest Service acknowledged in the Forest Plan that one of its "primary missions" is "provid[ing] high-quality water in sufficient quantities to meet all needs of natural resource and human requirements." *Id.* at p. 24. Its other top-tier management goal is the protection of the mighty oak, which previously dominated the Ozark National Forest's landscape and has been in decline because of crowding by other vegetation in the lower canopy. *Id.* at p. 26. The Forest Service fears that without a "combination of regeneration cutting methods and silvicultural tools such as prescribed burning, thinning, planting, and herbicides," "it is likely that some oak stands will convert to shade tolerant forest types" which will take over and drive the oak out of existence. *Id.* Whole ecosystems native to the Ozark National Forest are dependent on oak trees and will also die out if oak stands fail to thrive. *Id.* Controlled burning, or "prescribed fire," is recommended by the Forest Service as "an essential tool for creating and maintaining functional [pine and oak] ecosystems" and "reduc[ing] fuel loads" to decrease the likelihood of catastrophic, deadly wildfires. *Id.* at pp. 26–27.

According to the Forest Plan, both the Ozark and St. Francis National Forests were once fire-dominated ecosystems. Scientists have discovered that in pre-colonial times, "a high percentage of the Ozark forests were most often open woodlands with widely spaced

trees, grassy or herbaceous ground cover, and a distinct 'park-like' appearance." *Id.* at p. 26. This patchwork mosaic of forest types provided "ample forage for many species of wildlife and maintained habitats for pollinators." *Id.* at p. 973. But due to the fire suppression regime of the last century, the current make-up of the Ozark National Forest, including Robert's Gap, is vastly different from its historical counterpart. *Id.* at p. 38.

The Forest Plan meticulously discusses forest-wide standards (abbreviated "FW") to govern methods of vegetation management; fish and wildlife preservation; soil, water, and air quality protection; trail and scenery maintenance; and fire management in the entire Ozark National Forest. *See id.* at pp. 150–70. Important to this lawsuit are the following standards, which operate as default requirements—in the absence of project-specific directives—for all Forest Service employees and contractors who perform work in the Ozark National Forest:

### APPLICATION OF HERBICIDES

**FW-21** Herbicides are applied at the lowest rate effective in meeting project objectives and according to guidelines for protecting human and wildlife health. Application rate and work time must not exceed levels that pose an unacceptable level of risk to human or wildlife health . . . .
. . . .

**FW-27** No soil-active herbicide is ground applied within 30 feet of the drip line of non-target vegetation specifically designated for retention (e.g., den trees, hardwood inclusions, adjacent untreated stands) within or next to the treated area. However, chemical side pruning is allowed in this buffer if necessary, but movement of herbicide to the root systems of non-target plants must be avoided. Buffers are clearly marked before treatment so applicators can easily see and avoid them.
. . . .

**FW-30** Herbicide mixing, loading, or cleaning areas in the field are not located within 300 feet of private lands, open water or wells, or other sensitive areas.
. . . .

**FW-43** Karst[1] management zones (KMZs) will be applied in a manner similar to that of streamside management zones (SMZs). Where karst features are identified, the boundaries of the KMZs will be delineated according to significance of karst features or potential risks. For karst features that are of significance or where the potential risks to water resources are great, a KMZ of 100 feet will be applied. For karst features that are less significant or where minimal potential risks to water resources exist, a KMZ of 50 feet will be applied. Karst management zones are mitigation measures primarily for the protection and conservation of groundwater resources and cave dependent species. These buffer designations are minimums and can be increased as necessary to provide appropriate mitigation measures as deemed necessary. Activities prohibited within these areas include:

- Use of motorized wheeled or tracked equipment (except on existing roads and trails).
- Mechanical site preparation.
- Recreational site construction.
- Tractor constructed fire lines for prescribed fire.
- Herbicide application.
- Construction of new roads, skid trails, and log landings.
- Slash disposal.

## ENDANGERED INDIANA BATS

**FW-64** Project specific informal consultation will be done for all activities proposed within primary conservation zones. No disturbance that will result in the potential taking of an Indiana bat will occur.

**FW-65** In the primary conservation zone for the Indiana bat, the following new improvements and treatments are not permitted: permanent road construction, trails, grazing or hay allotments, wildlife openings, special uses, and integrated pest management using biological or species-specific controls. Other activities that create permanent openings are prohibited within the primary conservation zone.

. . . .

**FW-69** In the secondary zone buffer around Indiana bat hibernacula, live trees or snags, buildings, and other structures known to have been used as roosts by Indiana bats are protected from cutting and/or modification until they are no longer suitable as roost trees, unless their cutting or modification is needed to protect public or employee safety. Where roost tree cutting or

---

[1] Karst features include caves, sinkholes, and sinking streams that lead to subterranean environments. These underground aquatic systems and caves may contain a variety of microhabitats. (Doc. 52-1, pp. 50–51).

modification is deemed necessary, it occurs only after consultation with the USFWS.

### 2.  The Robert's Gap Project

Robert's Gap has received little forest management in the last twenty-five years. *See* Doc, 52-1, p. 880 (Jan. 2018 "Scoping Letter" sent to the public). According to the Forest Service, this lack of management has resulted in an ecosystem dominated by over-mature trees that are being edged out by fast-growing red maple and black gum. *See* Doc. 57-1, p. 164 (Robert's Gap Project Final EA). With its canopy of crowded, over-mature trees, Robert's Gap, like many other areas in the Ozark National Forest, is at risk of destruction due to disease, insect outbreaks, and out-of-control wildfires. *Id.* Moreover, the lack of regular, low-intensity fires in the Project area has directly contributed to "a reduction in the number of insects (pollinators), small mammals, seed eating birds, deer and wild turkey." *Id.* at p. 120.

To address these conditions, the Forest Service began developing a site-specific management plan in 2017. Once a draft proposal was finalized, the Forest Service sought public input by hosting two public meetings on February 27, 2018, and on March 1, 2018. Members of BRWA were in attendance. The Forest Service prepared a Draft EA and solicited public comment in August 2020. BRWA submitted its written comments and objections to the Draft EA shortly thereafter, in early September 2020. The Forest Service then absorbed those and other objections and published the Final EA (Doc. 57-1, pp. 117–80) and Draft Decision Notice, *id.* at pp. 181–98, in April 2021.

Both the Draft and Final EAs describe the Forest Service's Proposed Action Plan to manage Robert's Gap. The Proposed Action Plan features various types of structured timber harvesting, reintroduction of fire in the Project area through controlled burning, and

the use of herbicides to control non-desirable woody plant species. In addition to the Proposed Action Plan, the Forest service considered three alternatives. Alternative 1 was "No Action"; Alternative 2 was "No Herbicide"; and Alternative 3, called "Other Resources," included everything in the Proposed Action Plan *plus* the addition of twenty-four miles of mountain bike trails and the construction of a parking lot and trail leading to Hawksbill Crag.

The Proposed Action Plan describes four types of timber harvesting, all geared toward creating more open canopies and more favorable growing conditions in the Project area. First, the Forest Service plans to utilize a "regeneration harvest" technique on 965 acres of over-mature hardwood trees, such as oak and hickory. (Doc. 57-1, p. 127). Those acres are currently stocked with mature trees but few to no seedlings in the understory. The regeneration harvest method will "remove[ ] mature, over-mature, or diseased trees and establish[ ] new hardwood stands," which will allow more sunlight to filter down to the forest floor to help promote regeneration of hardwood seedlings. *Id.* The Forest Service intends to plant seedlings "to a stocking level of approximately 680 trees per acre." *Id.* Healthy canopy trees will be left intact to shelter the understory. *See id.*

Second, the Forest Service plans a "commercial thinning," or cutting,[2] operation on 5,905 acres in the Project area. *See id.* at p. 128. These sites currently have "too many trees per acre," which has resulted in a decline in the health of the overall tree stand. *Id.* According to the Forest Service, the thinning process will increase the spacing between trees to allow more room for growth and "leave a healthier and more vigorous stand of

---

[2] Commercial thinning yields tree products that are suitable for sale.

trees that are more resistant to natural disturbances such as wildfires and outbreaks of insects/disease." *Id.*

Third, the Forest Service proposes a non-commercial "improvement thinning" on 296 acres. *Id.* at p. 130. This harvesting method will remove "damaged, diseased, suppressed[,] and poorly formed" trees to allow the healthier trees in the stand to better flourish under less competitive conditions. *Id.*

Fourth, the Service intends to conduct a "manual release" thinning on 139 acres using only "hand tools (chainsaws or brush saws)." *Id*.

Along with timber harvesting, the Proposed Action Plan contemplates the controlled application of fire on 13,468 acres in the Project area. *Id.* at p. 126. The Forest Service previously introduced fire into small areas elsewhere in the Ozark National Forest and monitored the results. Based in part on that firsthand data, the agency is convinced that "the reintroduction of fire . . . [will] improve[ ] conditions within prescribed burn areas within the district" and benefit the overall biodiversity, health, and vigor of the Ozark National Forest. *Id.* Twenty-seven miles of "control lines" will be set up adjacent to private property to protect these areas from fire. *Id.* "After burns are completed, the control lines [will] be stabilized and may be seeded with legumes and annuals such as clovers, winter wheat, oats and annual rye grass or native grasses and forbs to restore vegetative cover and m[ax]imize erosion control." *Id.* at p. 127.

The third and final part of the Proposed Action Plan involves the manual application of EPA-approved herbicides on 2,417 acres. *Id.* at p. 131. Though the Forest Service views controlled burning as the most effective means of stopping the growth of undesirable plant species, there are some areas where fire cannot be safely introduced.

In such areas, herbicides will be used, "mix[ed] . . . off site" by workers who will only "tak[e]

with them an amount of mixed herbicide sufficient for one day's application." *Id.* at p. 175.

The Final EA explains that herbicide application is necessary because in some cases,

simply cutting down trees will not control pernicious species:

> Many of the existing understory species, like red maple, sprout prolifically
> when cut. With manual-only site preparation [i.e., sawing or cutting], stands
> of pine or oak regeneration would have a difficult time competing with the
> already established maple sprouts, and stand composition would change
> from pine or oak to more mesic hardwoods without repeated manual
> treatments.

*Id.* at p. 165.

The Final EA's discussion of herbicides further specifies that "[n]o aerial

application" will be utilized in the Project area. Instead, herbicides will be applied "using

ground-based spray methods using a backpack containing the herbicide attached to a

flexible sprayer, wand or other hand application device that directs the chemical onto the

target vegetation." *Id.* at 168. The Final EA also incorporates by reference the Forest

Plan's directives on herbicide use. *See id.* at p. 175. According to the Forest Plan, various

safety measures must be observed when applying herbicide to protect the water quality

in the Buffalo River Watershed. Workers must implement buffer zones around karst

landscapes where water tends to precipitate quickly through the soil with minimal filtration.

*See* Doc. 52-1, p. 156. In these buffer zones, the use of herbicides is strictly prohibited.

*See id.*

### 3.  The Bat Amendment to the Forest Plan

In January 2020, before the Draft EA was released for public comment, the Forest

Service was in the process of collaborating with biologists from the U.S. Fish and Wildlife

Service to amend the Forest Plan in response to new information the agencies had

received about the presence of an endangered species, the Indiana bat, in the Ozark National Forest.

According to Section 7(a)(2) of the Endangered Species Act, federal agencies like the Forest Service must ensure that any action they propose to carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). The Forest Plan specifically contemplates and authorizes tree cutting, controlled burning, and the application of herbicide in the Ozark National Forest to achieve the Forest Service's goal of restoring the ecosystem to a healthy state. Accordingly, the Forest Service asked the Fish and Wildlife Service to prepare a Biological Opinion, or "BiOp," to address whether any actions contemplated in the Forest Plan were likely to jeopardize an endangered or threatened species. 50 C.F.R. § 402.14(a).

The Fish and Wildlife's Service's BiOp was submitted to the Forest Service on May 7, 2020, in full compliance with the requirements of the Endangered Species Act. *See* Doc. 58-1, pp. 202–51. The BiOp observed that the Ozark National Forest is located "near the far southwestern edge of the [Indiana bat's] range." *Id.* at p. 225. However, thousands of bats are known to hibernate through the northern and western parts of Arkansas, with increasingly higher numbers observed hibernating in caves in the Ozark National Forest in winter 2019/2020. *Id.* Though the BiOp noted that "[t]racking efforts conducted" as of May 2020 had not indicated that pregnant Indiana bats were using trees in the Ozark National Forest as roosting sites to bear and suckle their young, *id.* at p. 226, the Fish and Wildlife Service anticipated that "stressors(s) (i.e., the alteration of the environment that is relevant to the species)" could injure Indiana bats *if* they were to establish maternity

colonies in the Ozark National Forest in the future, when forest management projects were under way, *id.* at p. 228.

In October 2020, the Forest Service drafted an EA titled "Forest Plan Amendment for Bat Conservation" ("Bat Amendment"). *See id.* at pp. 252–89. The public was given an opportunity to comment and object to the Draft EA for the Bat Amendment, and then on March 17, 2021, the Forest Service issued a NEPA-compliant Decision Notice and FONSI approving the Bat Amendment. One of its core purposes is to ensure that "the proper protective measures [for maternity colonies] are in place and will not delay project implementation [in the Ozark-St. Francis National Forests] if one is found." *Id.* at pp. 262–63. To that end, the Bat Amendment contains a number of  FWs  to protect the Indiana bat and its habitat. FW-163 specifically provides the following:

- If Indiana bat maternity trees are discovered within the [Ozark-St. Francis National Forests], those trees would be protected.

- No tree falling would occur within 150 feet of known maternity trees unless their cutting or modification is needed to protect public or employee safety.

- Where tree cutting or modification is deemed necessary within this area, it must be coordinated with [U.S. Fish and Wildlife].

- During the maternity period (April 1 to August 15), activities that may disturb the colonies, such as timber harvest, use of heavy equipment, and prescribed fire would be prohibited in an area approximately ¼ mile from known maternity roost trees.

*Id.* at p. 292.

#### 4.  Public Comment on the Robert's Gap Project's Final EA and Discovery of Indiana Bat Maternity Colony

On May 20, 2021, BRWA submitted objections to the Robert's Gap Project's Final EA. *See* Doc. 57-1, pp. 200–05. These objections noted the non-profit's concerns

regarding the cumulative impacts of roads, timber harvesting, prescribed burning, and herbicides on the water quality of the Buffalo National River. *Id.* at p. 202. BRWA asked that herbicides "be eliminated altogether from this project." *Id.* at p. 203. It observed that prescribed burning and herbicides tend to disrupt the Forest's biotic community, including endangered bats. *Id.* at 204. BRWA also noted the "unpredictable karst hydrogeology" in the area and requested that a formal EIS be prepared to address how the Project would affect the Buffalo National River, the White River, and the Kings River. *Id.* at pp. 204–05.

The Forest Service held an objection-resolution meeting on July 27, 2021 to speak with interested members of the public and receive clarification on certain objections. BRWA's members attended that meeting. However, just before the meeting occurred, Forest Service workers located the first Indiana bat maternity colony in the Ozark National Forest—in Robert's Gap. During the public meeting, Forest Service workers informed the attendees about the maternity colony, and District Ranger Timothy E. Jones led a discussion about the discovery. Attendees were informed that the Forest Service had already implemented protective measures for Indiana bat maternity colonies through the final approval of the Bat Amendment to the Forest Plan. *See id.* at p. 224–26 (Forest Service's Objection-Resolution Meeting Notes).

On August 5, 2021, the Forest Service responded in writing to BRWA's objections to the Final EA, *see id.* at pp. 229–40, and a representative of BRWA replied via email on August 23, *see id.* at p. 241.

### 5. Robert's Gap Project's Decision Notice/FONSI

On October 27, 2021, the Forest Service issued a Decision Notice and FONSI for the Project. *See* Doc. 57-1, pp. 243–59. The Forest Service decided to adopt Alternative

3 with certain modifications, including: (1) mandatory water-quality monitoring each quarter, including baseline sampling to measure changes in turbidity, pH, conductivity, and temperature, beginning in the Fall of 2021, *id.* at p. 250; and (2) site-specific modifications to the Bat Amendment to provide increased protection to the Indiana bat, namely, moving the date to begin timber harvesting and controlled burning from August to October and establishing a protection zone around the colony's known foraging and maternity roost trees. *See id.*

The Decision Notice approved over 10,000 acres of various types of commercial logging, several thousand acres of herbicide use, over 11,000 acres of prescribed burning, over 30 miles of new and temporary roads, and over 21 miles of fire-control lines to facilitate all of these activities. *See id.* at pp. 243–48.

### C. Procedural Background of the Instant Case

BRWA retained counsel who wrote a letter to the Forest Service on May 24, 2022, requesting that the Decision Notice be rescinded and that an EIS be prepared "to address the failure to conduct a baseline analysis for water quality and failure to adequately address the discovery of an Indiana bat maternity colony, an endangered species." (Doc. 59-1, pp. 30–31). The agency failed to respond to the letter. BRWA then filed its original complaint (Doc. 2) on February 21, 2023, and on June 7 filed an Amended Complaint (Doc. 15) to include information it received in response to a Freedom of Information Act request directed to the Forest Service.

There are seven claims for which BRWA seeks judgment.[3]

---

[3] Though there are eight claims in the Amended Complaint, BRWA does not seek judgment on Count 5. *See* Doc. 38, p. 1 n.1.

- **Count 1** alleges a violation of NEPA due to the Forest Service's failure to take a "hard look" at the Robert's Gap Project's potential effects on the Buffalo National River, particularly in terms of the river's unique characteristics and "Wild and Scenic" designation;

- **Count 2** alleges the Forest Service's failure to take a "hard look" at how the Project could impact water quality in the headwaters of the Buffalo National River;

- **Count 3** alleges the Forest Service's failure to take a "hard look" at how the Project could impact the endangered Indiana bat;

- **Count 4** alleges the Forest Service deprived the public of the opportunity to comment on significant circumstances that arose after the Project was approved, namely, the discovery of an Indiana bat maternity roost within the territory of the Project and the collection of a baseline water-quality measurement;

- **Counts 6 and 7** allege the Forest Service violated and continues to violate NEPA by refusing to supplement its EA or produce a Supplemental EIS to address the circumstances that arose after the Project was approved, namely, the discovery of the Indiana bat maternity roost and the collection of a baseline water-quality measurement; and

- **Count 8** alleges that the Forest Service acted arbitrarily and capriciously by preparing an EA and FONSI rather than a full-scale EIS.

On January 16 and February 20, 2024, the parties filed Cross-Motions for Summary Judgment (Docs. 38 & 45). Consistent with this matter's Scheduling Order (Doc. 22), the parties filed a Joint Appendix (Docs. 52–59) containing only those portions of the administrative record they intended to rely on in their summary judgment briefing. The Court heard oral argument on the Motions on May 13, 2024.

## II. LEGAL STANDARD

Judicial review of agency actions under NEPA is governed by the Administrative Procedure Act ("APA"). *Friends of the Norbeck v. U.S. Forest Serv.*, 661 F.3d 969, 973 (8th Cir. 2011) ("While NEPA does not authorize a private right of action, the Administrative Procedure Act (APA) permits judicial review of whether an agency's action complied with NEPA."); 5 U.S.C. §§ 701 *et seq*. Under the APA, the Court must find unlawful any agency

16

action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), and must "compel agency action unlawfully withheld," *id*. § 706(1). "When reviewing an agency's final decision, the court's duty on summary judgment is to determine whether the evidence in the administrative record permitted the agency to make that decision as a matter of law." *Nw. Env't Advoc. v. U.S. Env't Prot. Agency*, 855 F. Supp. 2d 1199, 1204 (D. Or. 2012). Under this standard, the Court has the responsibility to verify that the agency's conclusion follows from the premises that the agency relied upon. *Audubon Soc'y v. Dailey*, 977 F.2d 428, 434 (8th Cir. 1992).

In determining whether an agency decision was arbitrary, capricious, or unlawfully withheld, the Court "must consider whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). The Court must set aside agency action if the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Eighth Circuit has adopted four additional factors to consider when evaluating whether an agency acted arbitrary and capricious actions in issuing a FONSI and declining to issue an EIS:

> (1) whether the agency took a hard look at the problem, as opposed to making bald conclusions, unaided by preliminary investigation;

> (2) whether the agency identified the relevant areas of environmental concern;

(3) whether, as to problems studied and identified, the agency made a convincing case that the impact is insignificant; and

(4) if there was impact of true "significance," whether the agency convincingly established that changes in the project sufficiently minimized it.

*Audubon Soc'y of Cent. Ark. v. Dailey*, 977 F.2d 428, 434 (8th Cir. 1992) (citing *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 681–82 (D.C. Cir. 1982)).

### III. DISCUSSION[4]

### A. Counts 1, 2, and 3: BRWA's "Hard Look" Claims

BRWA accuses the Forest Service of violating the APA by failing to take a "hard look" at certain environmental issues related to the Robert's Gap Project. "NEPA requires that the agency take a hard look at the environmental consequences of a project before taking a major action." *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999). The Court's role in a "hard look" challenge under NEPA "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or

---

[4] The Court disagrees with the Forest Service's threshold argument that BRWA failed to adequately exhaust administrative remedies prior to filing suit. The Forest Service contends that BRWA's objections and comments made before filing suit are not *exactly* the same as the challenges BRWA now raises here, so the Court should decline to review the claims and find them waived. Having read the lengthy administrative record in full, the Court finds that BRWA adequately alerted the Forest Service to its "position and contentions in order to allow the agency to give the issue[s] meaningful consideration." *Dep't of Transp. v. Public Citizen,* 541 U.S. 752, 764 (2004) (quotation omitted). The "rationale underlying the exhaustion requirement is to avoid premature claims and to ensure that the agency possessed of the most expertise in an area be given first shot at resolving a claimant's difficulties." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002). That rationale has been met here, and the Court will therefore proceed to address BRWA's claims on the merits.

capricious." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97–98.

The Court bears in mind that NEPA's purpose is "to insure a fully informed and well-considered decision, not necessarily a decision [a judge] would have reached had [he or she] been [a] member[ ] of the decisionmaking unit of the agency." *Vermont Yankee*, 435 U.S. at 558. Furthermore, NEPA does not prohibit an agency from taking actions that harm the environment, so long as "the adverse environmental effects of the proposed action are adequately identified and evaluated." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

### 1. Count 1: Buffalo National River

In Count 1, BRWA claims the Forest Service failed to take a hard look at the Project's potential effects on the Buffalo National River because the Final EA does not contain enough discussion about the National River specifically. The Court disagrees. The Final EA explicitly refers to the publicly available Forest Plan, which contains specific analysis concerning environmental considerations and forest-wide requirements for managing all forested areas in and around the Buffalo National River. Indeed, the agency's written response to BRWA's objections to the Project's Final EA took care to explain that the Forest Plan's standards would apply to the Project and would adequately protect water quality in the Project area—including the water downstream. *See* Doc. 57-1, p. 229.

Here, the Project's Final EA appropriately "tiers" to the Forest Plan's EIS. "Tiering" is the process by which an agency incorporates by reference a broad EIS into a narrow, project-specific EA. 40 C.F.R. § 1502.28. Tiering saves an agency money and time by

avoiding repetitive discussions and focusing on the issues unique to the project at hand. There is nothing wrong with tiering, and in fact, the regulations encourage it. *See* 40 C.F.R. §§ 1502.20, 1508.28; *see also Newton Cnty. Wildlife Ass'n v. Rogers,* 141 F.3d 803, 809 (8th Cir. 1998) ("If an agency has prepared an EIS for a large action, the regulations *encourage* it to incorporate EIS conclusions into EAs prepared for smaller, subsequent actions included within the broad program." (emphasis added)).

The Project's Final EA and the Forest Plan's EIS—together—demonstrate the Forest Service's keen awareness that the Buffalo National River presents a unique, wild, unspoiled, and beautiful environment that is deserving of the highest level of care and protection. *See* Doc. 52-1, pp. 98–103 (discussing the Forest Service's management goals for "Wild and Scenic Rivers" and noting their proximity to the Buffalo National River); *id.* at pp. 701–02 (describing the Buffalo National River and its "unique scenic and scientific features" and the Upper Buffalo Wilderness as a "Class I Air Quality Area" with water that "is clear and exhibits rapids and still pools with reflecting qualities").

The Project's Final EA also observes a number of times that the headwaters of the Buffalo National River—which lie within the Project area—empty into, and, thus, directly affect, the Buffalo National River. *See*, *e.g.*, Doc. 57-1, pp. 150–51 (Project Final EA). The Court is satisfied that the Forest Service gave a hard look at the negative environmental impact the Project's activities might have on all aspects of the land and water in and around the Project area, including the effects on water, soil, air, and wildlife downstream from the Project. Count 1 is **DISMISSED**.

## 2.  Count 2: Water Quality

Count 2 asserts that the Forest Service failed to take a hard look at the Project's potential negative impact on water quality, both in the Project area and in the Buffalo National River, because the agency disclosed *after* the Final Decision Notice was published that it had recently collected baseline water samples from the Project area. The water samples showed that the water in the Project area was, in BRWA's words, "essentially pristine in terms of herbicide pollution." (Doc. 47, p. 16). BRWA also complains that it only discovered after this lawsuit was filed that no herbicides have been used in the Project area for the past forty years. For some reason, BRWA believes that the Final EA's water-quality projections are suspect because they only *assumed* the water was pure instead of *confirming* that fact through baseline testing.

Since the Forest Service's assumptions were correct, its water-quality projections are not suspect—at least not because of a lack of baseline testing. The Forest Service possessed historical knowledge that the water quality in the Project area was pure because no management activity—including herbicide use—had occurred in several decades. The Final EA appropriately tiers to forest-wide standards concerning the proper handling and mixing of herbicides in the karst landscape. In addition, the EA implements extra protection measures to address the unique terrain in Robert's Gap. The application of herbicides will only be done by individual workers who must first set up buffer zones to eliminate the possibility that these substances will impact aquatic sites and residential areas. In addition, the Forest Service is requiring quarterly water-quality sampling and analysis which will be shared with the public. All of these facts indicate that the Forest Service took a hard look at water quality. Count 2 is **DISMISSED**.

### 3.  Count 3: Indiana Bat

In Count 3, BRWA accuses the Forest Service of failing to take a hard look at the possible effects of Project activities on the endangered Indiana bat. As explained above, the Forest Service in conjunction with the Fish and Wildlife Service prepared an amendment to the Forest Plan to specifically address the endangered Indiana bat. The purpose of creating the Bat Amendment was to make sure that "the proper protective measures [for a maternity bat colony] are in place and will not delay project implementation if one is found." (Doc. 58-1, pp. 262–63). The recent discovery of a maternity colony in the Project area does not require the Forest Service to redo all the work it already did in preparing the Bat Amendment; it was enough for the Forest Service to tier the Bat Amendment to the Project's Decision Notice and FONSI. Since the Forest Service took a hard look at the need to protect the Indiana bat, Count 3 is **DISMISSED**.

### B.  Count 4: Need for Public Comment on "New" Developments

BRWA argues in Count 4 that the Forest Service should have given the public an opportunity to comment on certain new and significant developments that occurred after the Final EA was published. These are: (1) the discovery of the Indiana bat maternity colony and the agency's proposal for additional protective measures and (2) the new baseline water-quality data.

"The public comment process is not essential every time new information comes to light after [a NEPA document] is prepared." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (citation omitted) (cleaned up). As previously stated, the discovery of the Indiana bat maternity colony was anticipated by the Forest Service and was the subject of a NEPA document—the Bat Amendment to the Forest Plan—that was incorporated by reference in the Project's Decision Notice. As such, the discovery of the

maternity colony was not a new or changed circumstance that warranted separate comment, objection, or public scrutiny pursuant to NEPA. As for the baseline water quality data, it revealed nothing new and only confirmed what the agency had assumed while constructing its water-quality models. Count 4 lacks merit and is **DISMISSED**.

### C. Counts 6, 7, and 8: Need to Produce an EIS or Supplemental EA

Counts 6, 7, and 8 accuse the Forest Service of violating the APA and NEPA by failing to prepare an EIS or supplemental EA. Supplemental documentation must be prepared if an agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or if "[t]here are significant new circumstances or information about the significance of adverse effects that bear on the analysis." 40 CFR § 1502.9(d)(1)(i)–(ii).

BRWA contends that the Forest Service made substantial changes to the Project in the Decision Notice itself, when the agency added extra protections for the newly discovered Indiana bat maternity colony and ordered water-quality samples to be taken every year for the life of the Project. The Court finds that these changes do not merit an EIS or supplemental EA.

The first protective measure in the Decision Notice concerns the Indiana bat. The Forest Service decided to extend protection for maternity roost trees, which would effectively delay any tree cutting, burning, or herbicide application in and around known or suspected roost trees until later in the fall of each calendar year. The Forest Service possessed the discretion to amend the timeline to *further protect* the bat. Such discretion is contemplated by the Fish and Wildlife Service's BiOp supporting the Bat Amendment. The Decision Notice also creates "a protection zone encompassing the colony's known

foraging and maternity roost tree." (Doc. 57-1, p. 250). This clarifies the Bat Amendment's FW-163 by providing further detail about which maternity roost trees are to receive extra protection. *Id.* at p. 292. These are not "substantial changes" to the Project—and neither is the water-testing requirement. The Court bears in mind that "a *reduction* in the environmental impact is less likely to be considered a substantial change relevant to environmental concerns than would be an *increase* in the environmental impact." *Ark. Wildlife Fed.*, 431 F.3d at 1103 (emphasis added and citation omitted). Clearly, both the added bat provisions and the water-quality testing requirement *reduce* the likelihood of negative environmental impact and offer greater protection to both the bats and the public.

A new or changed circumstance only warrants the preparation of an EIS when it "affect[s] the quality of the human environment in a significant manner not already considered by the federal agency." *Ark. Wildlife Fed. v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1102 (8th Cir. 2005) (cleaned up)). Requiring an agency to prepare a supplemental NEPA document every time new information comes to light "w[ill] render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made.'" *Id.* at 1104 (quoting *Marsh,* 490 U.S. at 374). The Court finds that the Forest Service's decision not to prepare an EIS or supplemental EA was not arbitrary and capricious. Counts 6 and 7 are **DISMISSED**.

As for Count 8, BRWA urges the Court to find that the agency's FONSI determination was wrong. "If an agency takes a 'hard look' and determines that the proposed action has no 'significant' environmental impact [under these factors], an EIS is unnecessary." *Heartwood Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 431 (8th Cir. 2004). For the reasons previously stated, the Court is persuaded that the Forest Service took a hard

look at all the issues BRWA raised. The FONSI is supported by reason, discussion, consideration of possible alternatives, and scientific evidence, and the Final EA and Decision Notice identified the relevant areas of environmental concern with respect to the Project and made a convincing case that the environmental impact is not significant when balanced against the Project's important goals. Count 8 is therefore **DISMISSED**.

### IV. CONCLUSION

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 45) is **GRANTED** and Plaintiff BRWA's Motion for Summary Judgment (Doc. 38) is **DENIED**. This case is **DISMISSED WITH PREJUDICE**, and judgment will enter contemporaneously with this opinion.

**IT IS SO ORDERED** on this 30th day of September, 2024.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE